IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY ROBINSON,

                Petitioner,

      vs.

WILLIAM KNIPP,[1] Warden, Mule Creek
State Prison,

            Respondent.

No. 2:10-cv-01410-JKS

MEMORANDUM DECISION

Larry Robinson, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Robinson is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at Mule Creek State Prison. Respondent has answered, and Robinson has replied.  In his Reply, Robinson requests an evidentiary hearing.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Following his conviction by a jury of one count each of assault with a deadly weapon (Cal. Penal Code § 245(a)(1)) and of making criminal threats (Cal. Penal Code § 422), in June 2007 the Sacramento County Superior Court sentenced Robinson, a "three-strikes felon," to two concurrent terms of twenty-five years to life, with the possibility of parole, plus a determinate fifteen-year term on prior felony enhancements.  The California Court of Appeal, Third Appellate District, reversed the findings on two of the strikes and remanded, giving the People the option to

---

[1] William Knipp, Warden, Mule Creek State Prison, is substituted for Larry Small, Warden, Calipatria State Prison.  Fed. R. Civ. P. 25(d).

retry the strike allegations, and affirmed Robinson's conviction and sentence in all other respects in an unpublished decision.[2]  The California Supreme Court denied review on March 11, 2009. On remand the People elected not to retry Robinson on the two strikes, and the Sacramento County Superior Court re-sentenced Robinson to concurrent prison terms of twenty-five years to life, plus an additional five years for a prior serious felony.  On May 3, 2010, the California Court of Appeal affirmed the sentence in an unpublished decision.[3]  On April 17, 2010, Robinson, appearing *pro se*, filed a petition for habeas relief in the Sacramento County Superior Court, which denied his petition in an unreported, reasoned decision on May 12, 2010. Robinson's subsequent *pro se* petition for habeas relief in the California Supreme Court was summarily denied without opinion or citation to authority on January 19, 2011.[4]

Robinson timely filed his Petition for relief in this Court on May 29, 2010.  This Court granted Robinson's request to stay these proceedings while he exhausted his unexhausted claims in the California State Courts.[5]  The stay was lifted on March 25, 2011, and Respondent was ordered to file a response.[6]

---

[2] *People v. Robinson*, No. C056330, 2008 WL 5077583 (Cal. Ct. App. Dec. 3, 2008) ("*Robinson I*").

[3] *People v. Robinson*, No. C062397, 2010 WL 1919943 (Cal. Ct. App. May 13, 2010) ("*Robinson II*).  The parties do not indicate that Robinson sought further review of this decision in the California Supreme Court, and this Court's search of the California Appellate Courts Case Information available on-line at http://appellatecases.courttinfo.ca.gov. does not reveal that Robinson sought further review in the California Supreme Court.

[4] It does not appear from the record that Robinson filed a petition for habeas relief in the intermediate California appellate court, the California Court of Appeal.

[5] Docket No. 7.

[6] Docket No. 19.

The factual basis for Robinson's conviction as recited in *Robinson I*:

## FACTUAL BACKGROUND

On January 10, 2006, 14-year-old Nicholas J. and his 12-year-old younger brother, R.J., were living in a home with their mother, older sister Louise W., and other siblings, near Valley High School in Sacramento.

Around 7:00 p.m., the boys' mother said she saw someone in a car outside their house, and asked Nicholas and R.J. to check to see if anyone was there.

The two boys emerged from the house. R.J., the younger boy, was carrying a pole or a stick.  As they approached the car, they saw defendant, whom they recognized, slumped over in the back seat of the car.  He seemed to be drinking something.  One of the boys threw a cup at the car.  Defendant then tried to open the car door, but the boys pushed against it, trying to keep it shut.  Defendant forced the door open.  Nicholas tried to run away, but defendant grabbed him by the shirt from behind, ripping it.  Defendant reached into his back pocket, pulled out a knife with a four- or five-inch-long blade and yelled, "I'll kill you motherfucker," or "I'll stab you motherfucker," and swung the knife at Nicholas twice, extending his right arm with a crossing motion.

R.J. hit defendant with the stick, causing him to let go of Nicholas. Both brothers then took off running down the street, with defendant in pursuit.  He chased them into a school yard and cornered them in front of a locked gate.  Defendant reached into his pants and yelled, "I have a gun."  At this point, the boys' sister Louise arrived, wielding a hoe or long pole, and threatened to hit defendant with it.  Defendant fled, still holding the knife and dropping a bottle along the way.

A patrol officer responding to a dispatch call spotted defendant jumping over a fence and apprehended him in the back yard of a house.  He conducted a pat-down search of defendant and recovered a box-cutter knife with a concealed blade. A steak knife was also found in the front yard of the property.

### Defense

Defendant testified that he was acquainted with Nicholas and R.J., since their mother is his brother's girlfriend.  On the evening in question, he was waiting in a car outside their house because he wanted to talk to his girlfriend Edna, who had been staying there for a couple of days.

He heard the garage door open and the two boys came out, "throwing stuff" at the car.  Defendant thought Nicholas had thrown a screwdriver and R.J. a bottle at the car.  He tried to get out to see what was going on, but the boys were pushing the door shut.  When defendant finally managed to get out, he noticed a knife on the ground.  He picked it up and, holding it above his head, he said, "What's going on here?  Why you all out here with knives?"  He told the boys he was going to tell their mother they were attacking him and throwing knives.  He then put the knife in his pocket.

Defendant acknowledged grabbing Nicholas and ripping his shirt, "to find out . . . what was going on."  When he did so, R.J. hit him with a stick and defendant took off running.  According to defendant, the boys chased him down the street, not

3

the other way around.  Both boys had "weapons" in their hands.  They came after him, "swinging and throwing stuff at me."  Defendant finally stopped running, because he was out of breath.  Trying to "scam [his] way" out of the situation, he told them, "You all come up near me anymore, I'm going to pull out my gun and shoot you."  He was unarmed, but said it to "scare them off."  The boys' sister Louise then approached with a stick in her hands, telling him "you shoot my brother, I'll hit you with this stick."  Louise struck him on the shoulder with the stick and defendant "tore off running again."  He admitted jumping over a fence to elude a police officer because he had a bad "experience about 30 years ago" when the police knocked all his teeth out and broke his nose.  He threw the knife away to avoid a conflict with the officer.[7]

## II.  GROUNDS RAISED/DEFENSES

In his Petition Robinson raises eight grounds:  (1) prosecutorial misconduct (misstatement of a fact); (2) the trial court improperly "stripped" him of the presumption of innocence; (3) insufficiency of the evidence to support the conviction of assault with a deadly weapon; (4) insufficiency of the evidence to support the conviction of criminal threat; (5) the trial court improperly instructed the jury on the elements of criminal threat; (6) use of false evidence to support his conviction; (7) prosecutorial misconduct in use of false evidence; and (8) ineffective assistance of counsel (failure to investigate an ambiguity in the police records).  Respondent contends that Robinson's first and fifth grounds are procedurally barred.  Respondent asserts no other affirmative defenses.[8]

---

[7] *Robinson I*, 2008 WL 5077583 at *1-2.

[8] With respect to Robinson's sixth and seventh grounds (raised in this state habeas petition), although Respondent notes that the Sacramento County Superior Court found these claims were untimely, Respondent does not assert this as procedurally barring this Court from determinating those claims on the merits.  Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2012).  Because of this, coupled with the fact that the Sacramento County Superior Court also decided Robinson's petition on the merits, this Court will also address those claims solely on the merits.

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[9]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[10]  The holding must also be intended to be binding

upon the states; that is, the decision must be based upon constitutional grounds, not on the

supervisory power of the Supreme Court over federal courts.[11]  Thus, where holdings of the

Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that

the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[12]  When a claim falls

under the "unreasonable application" prong, a state court's application of Supreme Court

---

[9] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[10] *Williams*, 529 U.S. at 412 (alteration added).

[11] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[12] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

precedent must be "objectively unreasonable," not just "incorrect or erroneous."[13]  The Supreme

Court has made clear that the objectively unreasonable standard is "a substantially higher

threshold" than simply believing that the state-court determination was incorrect.[14]  "[A]bsent a

specific constitutional violation, federal habeas corpus review of trial error is limited to whether

the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"[15]  In a federal habeas proceeding, the standard under which this Court must assess the

prejudicial impact of constitutional error in a state court criminal trial is whether the error had a

substantial and injurious effect or influence in determining the outcome.[16]  Because state court

judgments of conviction and sentence carry a presumption of finality and legality, the petitioner

has the burden of showing by a preponderance of the evidence that he or she merits habeas

relief.[17]

> The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  *Cf. Felker v.
> Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing
> AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue
> the writ in cases where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents.  It goes no farther.*

---

[13] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[14] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[15] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[16] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[17] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[18]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[19] State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[20] This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[21]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal. If denied relief by the

---

[18] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[19] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[20] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[21] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[22] This is considered as the functional equivalent of the appeal process.[23]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[24]  This presumption applies to state-trial courts and appellate courts alike.[25]

## IV.  DISCUSSION

### A.    Procedural Default

Respondent contends that Robinson's first and fifth grounds are procedurally defaulted. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[26]  This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in

---

[22] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[23] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[24] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[25] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[26] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

raising the claims . . . ."[27]  Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case, clearly and expressly states that its judgment rests on a state procedural bar.[28]  "[I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default."[29]  A discretionary state procedural rule can be firmly established and regularly followed, so as to bar federal habeas review, even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.[30]

Ground 1:  Prosecutorial Misconduct (Misstatement of the Facts)

Robinson argues that the prosecutor committed misconduct during oral argument by arguing that Robinson was intoxicated at the time of the crime and that, after he was arrested, Robinson was housed at the detox unit.  The California Court of Appeal rejected Robinson's arguments, holding:

### I.  Prosecutorial Misconduct

Nicholas testified that when he and his brother first saw [Robinson], he appeared to be "drinking something" while slumped in the back seat of the car.  He also testified that as [Robinson] fled the school yard, he dropped a bottle, which "I think . . . was liquor."  R.J. said he saw [Robinson] with a bottle containing "blue stuff" in it.  Louise testified that when she confronted [Robinson], he had a knife in his back pocket and a beer bottle in his hand.

---

[27] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

[28] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[29] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

[30] *Walker v. Martin*, 131 S. Ct. 1120, 1128 (2011); *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009).

On cross-examination, the prosecutor asked [Robinson] if he had been drinking that evening. [Robinson] denied it. The prosecutor then asked [Robinson] if he, in fact, was "housed at detox" that night. [Robinson] answered "no." The prosecutor then offered to show [Robinson] the booking form describing where he was housed. [Robinson] declined, stating, "I know where I was housed at." The prosecutor repeated, "And isn't it true you were housed at detox?" whereupon [Robinson] replied, "Not for alcohol."

In her rebuttal argument, the prosecutor stated: "He [[Robinson]] sat up there and tried to make you guys believe that he is this great person, that he was just trying to talk some sense to these kids like why do you have the knife? Why are you doing this? . . . That's what he wants you to believe, that he was just acting as this very nice guy. . . . [¶] . . . [¶] And you know his story was all about making him look good. Think about the end of the line of questioning yesterday when I was talking to him about whether he was drunk and where he was housed in jail. He didn't want to tell you he had been drinking. He didn't want to tell you that he was drunk, and why not? Because it makes him look bad. How would you guys look at him if you had this drunk idiot swinging the knife at little kids when it's dark outside, threatening to kill them? You guys wouldn't think very highly of him at that point. So he tries to suppress that, tries to make it sound like, no, I was stone-cold sober. I don't even need to look at that. I know where they housed me. Wouldn't even look at the evidence that was confronting him because that made him look bad."

[Robinson] claims the prosecutor committed reversible misconduct in these remarks by telling the jury he was drunk that night when, in fact, there was no substantial evidence in the record to support this assertion.

The point is forfeited because, as [Robinson] acknowledges, there was no objection to the prosecutor's remarks or request for a curative admonition. (*People v. Williams* (1997) 16 Cal.4th 153, 220-221 (*Williams*); *People v. Wash* (1993) 6 Cal.4th 215, 265.)

We also find no misconduct. "'"It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom."'" (*Williams, supra,* 16 Cal.4th at p. 221, quoting *People v. Wharton* (1991) 53 Cal.3d 522, 567-568.) The observations of the prosecution witnesses enumerated above, coupled with [Robinson's] implied admission that he was housed at "detox" overnight, supported a reasonable inference that [Robinson] had been drinking to the point of inebriation. In a trial sharply focused on credibility, the prosecutor suggested that [Robinson] had lied about his drinking that night, and thus the jurors should be equally distrustful about his account of the incident in which he portrayed himself as an innocent victim. This was fair argument, not misconduct.

> Because we find no misconduct, [Robinson's] derivative claims of ineffective assistance of counsel and error in denying his motion for new trial on that ground, are moot.[31]

Under California law, the failure to object to prosecutorial misconduct waives the issue on appeal.[32]   In his Traverse, except to argue that the procedural default was excused because of his counsel's ineffectiveness, Robinson does not address the procedural default question.   In general, because the attorney is considered to be the defendant's agent, attorney negligence, oversight, or inadvertence is not cause sufficient to excuse a procedural default.[33]   Although the ultimate burden of proving adequacy of a state procedural bar is on the Respondent, once Respondent has "adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner."[34]   The petitioner may satisfy his burden "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."[35]   This, Robinson has failed to do.   Accordingly, this Court agrees with Respondent that Robinson procedurally defaulted on his first ground.[36]

Even if this Court were to reach the merits, Robinson would not prevail.   The federal rule regarding the leeway given to the prosecution in making arguments is identical to the California

---

[31] *Robinson I*, 2008 WL 5077583 at *2-3.

[32] *See People v. Williams*, 940 P.2d 710, 755 (Cal. 1997).

[33] *Coleman*, 501 U.S. at 753-54; *see Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (reaffirming the rule).

[34] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[35] *Id.*

[36] *See Fairbank v. Ayers*, 650 F.3d 1243, 1256-57 (9th Cir. 2011), *cert den.*, 132 S. Ct. 1757 (2012).

rule.  "'Prosecutors have considerable leeway to strike "hard blows" based on the evidence and all reasonable inferences from the evidence.'"[37]  Given the identical standards under the California rule and the federal rule, this Court cannot say that the decision of the California Court of Appeal was contrary to clearly established Federal law, as determined by the Supreme Court of the United States.[38]  Under the facts of this case, this Court cannot find that the California Court of Appeal's application of that law was objectively unreasonable, not just incorrect or erroneous.[39]  Robinson is not entitled to relief under his first ground.

Ground 5:  Improper Instruction on Elements of Criminal Threat

The trial court did not instruct the jury that an essential element for the crime of criminal threat was that the threat must not have been made in self-defense.  Robinson contends that this violates his due process rights.  The California Court of Appeal held that Robinson's argument was forfeited and was legally incorrect in any event:

> The argument is forfeited.  "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'"  (*People v. Sully* (1991) 53 Cal.3d 1195, 1218, quoting *People v. Lang* (1989) 49 Cal.3d 991, 1024.)
>
> Nor was counsel ineffective for failing to request the supplementary language defendant conjures.  As noted, defendant cites no authority that a defendant may successfully raise self-defense to a charge of making criminal threats in violation of section 422.  Further, the jury was given CALCRIM No. 252, which told them every charged crime required proof of the union of act and criminal intent.[40]

---

[37] *United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011) (quoting *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000)).

[38] 28 U.S.C. § 2254(d).

[39] *Wiggins*, 539 U.S. at 520-21.

[40] *Robinson I*, 2008 WL 5077583 at *10.

Having forfeited his objection to the jury instructions under state law, Robinson is procedurally barred from raising it in a federal habeas proceeding.[41]   In any event, because the California Court of Appeal held that the jury was properly instructed on the elements of state law and since there is no question that there was not any ambiguity which would have allowed the jury to apply the instruction in a way that violates the Constitution, that ends the matter.[42] Robinson is not entitled to relief under his fifth ground.

## B.      Evidentiary Hearing

Ordinarily, a federal habeas proceeding is decided on the complete state-court record and a federal evidentiary hearing is required only if the trier of fact in the state proceeding has not developed the relevant facts after a full hearing.[43]   In his petition for habeas relief in the Sacramento County Superior Court, Robinson included just immediately below the space for the case number, "*****Evidentiary Hearing Requested****"[44]   Robinson did the same in his habeas petition in the California Supreme Court.[45]   In his prayer for relief in both the Sacramento County Superior Court and the California Supreme Court, Robinson included: "2).   Hold an Evidentiary Hearing on the claims."   Also attached to his state habeas petition in the Sacramento

---

[41] *See Sochor v. Florida*, 504 U.S. 527, 534 (1992); *Engle v. Issac*, 456 U.S. 107, 125-29 (1982).

[42] *See Waddington v. Sarausad*, 555 U.S. 179, 190-92 (2009).

[43] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

[44] Lodged Doc. 10.

[45] Lodged Doc. 12.

County Superior Court were eight exhibits.[46]  Robinson attached the same eight exhibits to his

habeas petition in the California Supreme Court, plus four more (the lower court decision, letters

from his counsel, and the transcripts of the court testimony of Nicholas and Roderick Johnson).

The statements of Nicholas Johnson and Roderick Johnson that Robinson contended constituted

a recantation of their trial testimony were unsworn; the statements of Edna Torres and Wanda

Washington were sworn.  The relevant California Rule of Court addressing hearings in habeas

cases provides:

> **(f)  Evidentiary Hearing; when required**
> [. . . .]  An evidentiary hearing is required if, after considering the verified
> petition, the return, any denial, any affidavits or declarations under penalty of perjury,
> and matters of which judicial notice may be taken, the court finds there is a
> reasonable likelihood that the petitioner may be entitled to relief and the petitioner's
> entitlement to relief depends on the resolution of an issue of fact.  The petitioner
> must be produced at the evidentiary hearing unless the court, for good cause, directs
> otherwise.[47]

As the California Supreme Court has explained:

> Once the issues have been joined . . ., the court must determine whether an
> evidentiary hearing is needed.  If the written return admits allegations in the petition
> that, if true, justify the relief sought, the court may grant relief without an evidentiary
> hearing.  Conversely, consideration of the written return and matters of record may
> persuade the court that the contentions advanced in the petition lack merit, in which
> event the court may deny the petition without an evidentiary hearing.  Finally, if the
> return and traverse reveal that petitioner's entitlement to relief hinges on the
> resolution of factual disputes, then the court should order an evidentiary hearing.[48]

---

[46] Consisting of: (1) Post-conviction Statement of Nicholas Johnson); (2) Post-conviction
Statement of Roderick Johnson; (3) Sheriff's Special Need Form; (4) Sheriff's Arrest Report; (5)
Sheriff's Inmate Movements History; (6) "911 System" Printout; (7) Affidavit of Edna Torres;
and (8) Affidavit of Wanda Washington.

[47] Cal. Rules of Court, Rule 4.551(f).

[48] *People v. Romero*, 883 P.2d 388, 392-93 (Cal. 1994) (citations omitted).

Because it is presumed that the state courts knew and correctly applied state law,[49] implicit in the decisions of the California courts is that Robinson did not meet the requirements for an evidentiary hearing under California law.[50]

Robinson submits the same evidence as he submitted to the California Supreme Court in support of his Petition in this Court. The documents and factual arguments advanced based upon those documents relate solely to Robinson's sixth, seventh, and eighth grounds. In this Court, as was the case in the state courts, Robinson does not identify what evidence or testimony in addition to the documentary evidence attached to his petitions is to be proffered at an evidentiary hearing. Nor did Robinson identify any contested factual issue that required the California courts to hold and evidentiary hearing to resolve. Thus, it cannot be said on the record that the state courts precluded him from developing the factual basis for his claim.[51]

Because, as discussed below, resolution of Robinson's sixth, seventh and eighth grounds do not require the resolution of any factual conflict, his request for an evidentiary hearing is **DENIED**.[52]

---

[49] *Walton v. Arizona,* 497 U.S. 639, 653 (1990), *overruled on another ground by Ring v. Arizona*, 536 U.S. 584 (2002).

[50] It is readily apparent from the decision of the Sacramento County Superior Court that the court accepted as true the factual allegations in the documents Robinson attached to his petition and determined on the merits that Robinson was not entitled to relief on those undisputed facts.

[51] *See Pinholster*, 131 S. Ct. at 1417 n.5 (Sotomayer, J., dissenting) (assuming that the majority did not intend to preclude an evidentiary hearing when the petitioner's ability to develop the facts was the fault of the state court itself).

[52] *Landigran*, 550 U.S. at 474 ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.")

Ground 6:  Conviction on False Evidence

Robinson contends that he was convicted on false evidence.  Specifically, Robinson contends that after the trial and while the appeal was pending, two prosecution witnesses, Nicholas and Roderick Johnson, recanted their testimony.  Robinson also contends that two other witnesses have provided exculpatory affidavits as to what they would have testified to had they been called at the time of trial.  The Sacramento County Superior Court rejected Robinson's contentions, holding:

> [Robinson] fails to attach a copy of the reporter's transcript of the trial in the matter.  However, the court's underlying file does contain a reporter's transcript of the preliminary hearing, at which time Nicholas Johnson, then aged 14, testified that on the evening of January 10, 2006, he heard his mother say she had seen something in a car, so he walked outside and saw [Robinson] sitting in a car in the driveway and moving around.  Nicholas testified that he and his brother Roderick walked over, at which point he dropped a cup he was holding as [Robinson] opened the car door, which Nicholas and Roderick pushed back closed. Nicholas testified that he and Roderick started to run, and [Robinson] reached out and grabbed Nicholas's shirt and ripped it. Nicholas testified that Roderick picked up a stick and threw it at [Robinson], and [Robinson] let go of Nicholas, then reached into his back pocket and pulled out a steak knife.  Nicholas testified that [Robinson] swung the knife and said something. Nicholas testified that Nicholas told Roderick that [Robinson] had a knife, and [Robinson] said "yeah, I got a knife mother F'er, I'll cut you, I'll kill you." Nicholas testified that Nicholas and Roderick started to run, and [Robinson] chased them; Roderick picked up a stick and threw it, but [Robinson] still chased them. Nicholas testified that when they got to a school with a gate, [Robinson] stopped, then Nicholas's sister arrived with the stick and [Robinson] said he had a gun and "I'll shoot you."  Nicholas testified that [Robinson's] sister came after [Robinson] with a broom, and [Robinson] ran down the street, took a bottle from his hand, and threw it on the ground. Nicholas testified that the police caught [Robinson] a couple of blocks down at the corner.
>
> At the preliminary hearing, it was noted that Nicholas had made a statement to a police officer the night of the incident.  [Robinson] also fails to attach a copy of this statement to the instant petition.  However, defense counsel did not impeach Nicholas's preliminary hearing testimony with any inconsistent statement that might have been made in Nicholas's statement to police right after the incident, giving rise to the inference that the testimony and the prior statement were consistent.  Without any documentation to show otherwise, this court will presume that the two were

consistent and that only after trial and sentencing, and while the first appeal was pending, did Nicholas purportedly come forward with a recantation.

Office Nezik also testified at that preliminary hearing, that Nezik was on duty that evening and responded to a call about it. Nezik testified that he detained [Robinson] in a backyard of a home, and that a steak knife was found in the frontyard of the same home. Nezik also testified that he contacted Nicholas that evening, and saw that Nicholas's T-shirt was ripped open in the front and that Nicholas was holding it together with both hands. Nezik testified that he took Nicholas to see [Robinson], and Nicholas identified [Robinson] as the man that attacked him.

Roderick did not testify at the preliminary hearing, although both he and Nicholas testified at trial. The Third District Court of Appeal's summary of the trial evidence gives rise to the reasonable inference that both Roderick and Nicholas testified consistently with Nicholas's preliminary hearing testimony, except that at trial Nicholas admitted that he threw the cup at [Robinson] rather than simply dropped it.

[Robinson] now claims that both Nicholas and Roderick have recanted, and attaches a copy of hearsay claiming that this occurred. Specifically, [Robinson] attaches a copy of a note from "Bill" to "Art," attaching a purported "letter that Nicholas allegedly voiced to a neighbor," "had the neighbor write this up for him," "[t] he print is someone else's but the signature is signed in cursive, maybe it is Nicholas' signature. We might want to have a writing sample done on his signature and compare the two." The attached letter states "I Nicholas Johnson lied about what I said about [[Robinson]]. His girlfriend told me to lie because she was scared [sic] that he would hit her again. I am very sorry for the trouble I caused [[Robinson]]. When I was told what was becoming of my lie I felt so bad. [sentence crossed out with initials "N.J." next to it.] So Judge please forgive me." The signature follows, then "Also there was no knifes [sic] involved and my shirt was not riped [sic] by [[Robinson]] it was ripped by his girlfriend Edna." The letter is not dated.

[Robinson] also attaches a copy of an investigator's report of a telephone conversation that the investigator purportedly had with Roderick on May 14, 2009, who purportedly told the investigator that "Edna said she wanted us to lie to say they got into a fight. Edna was going to give us $45.00 to say he chased us (me and my brother) up and down the street with a knife. The police report said we had an argument and he was chasing us trying to get us. He was in our car sitting in there. When he came out he didn't have a knife in his hand. I don't remember. He didn't pull a knife on us. He was yelling at us and he had something in his pocket. He kept yelling at us and was coming towards us. My sister came out yelling at him. I think he said he had a knife. I never saw a knife. I told the police he had a knife. Edna said to say he tried to stab us. She said say he was trying to stab you and he would have if he could and that he beat her up. I don't think I went to court. I'm pretty sure I didn't tell the court this. Edna came over and paid use part of the $45.00. I was young I needed money I didn't know what this would do."

[Robinson] also attaches a sworn affidavit from Edna Torres, dated January 23, 2009, claiming that she is an inmate in a New Jersey prison, and that she had

wanted to testify at trial but could not because she was already an inmate there at that time. Edna states that on the night in question, she was at Wanda Washington's house when Wanda said Wanda though someone was in the car parked in the driveway. Edna states that Edna looked and saw the same thing. Edna states that Wanda called Wanda's sons Roderick and Nicholas and told them to check it out. Edna states that Edna went to the kitchen to call 911, and Nicholas came into the kitchen and got a knife then went outside. Edna states that Edna then went to the front door and saw the two brothers approach the car, the back left passenger door open, and [Robinson] exit the car. Edna states that Roderick and Nicholas began instantly to attack [Robinson], and Nicholas was wielding the knife while Roderick had a stick, and the two were chasing [Robinson] away from the residence down the street.

[Robinson] also attaches a sworn affidavit from Wanda Washington, dated April 29, 2009, who states that Edna was staying with Wanda as a visitor and had broken up with [Robinson], who was Edna's boyfriend. Wanda states that that night, [Robinson] called and talked to Edna on the telephone, then Edna stated that [Robinson] was coming over to talk about reconciliation. Wanda states that Wanda looked out the window and saw someone sitting in her car in the driveway. Wanda states that Edna looked out the window and said there was someone in the car. Wanda states that Wanda called to her son Nicholas and asked him to go out and see. Wanda states that Edna said Edna was going to the kitchen to call 911, Wanda states that Wanda went to the front door, and saw Nicholas walk toward the vehicle with a knife in Nicholas's right hand, and that Roderick had a stick held in both hands as if ready to swing. Wanda states that Wanda saw the left passenger door open and [Robinson] exit the car. Wanda saw a scuffle ensue, with Nicholas lunging at [Robinson] with the knife, and that [Robinson] retreated backward, then turned and started to run away, with Nicholas and Roderick in pursuit. Wanda admits in the statement that she told police that night that [Robinson] was in possession of the knife, but now claims that was not true and had said that only out of fear that [Robinson] would force Edna to move back in with him. Wanda states that she told Nicholas, Roderick, and her other child Louise to say that [Robinson] had a knife and that [Robinson] tried to cut Nicholas when exiting the car.

None of this warrants a new trial. Nicholas has not been shown to have signed any sworn affidavit. Nor would the new story purportedly from him ring true, as Nicholas is not shown to have indicated such a version of events until this writing surfaced after the conviction and sentencing of [Robinson] to a life term with more than 25 years as the minimum term. Even if the statement is from Nicholas, it is obviously "buyer's remorse," in feeling badly that his testimony resulted in such a severe sentence that all but guarantees that [Robinson] will not 1ive to be paroled or if paroled will be paroled at a very old age. And Nicholas was still a minor, and subject to persuasion after-the-fact from his mother regarding [Robinson].

Nor has Roderick signed any sworn affidavit. Rather, he purportedly only told this new version of events to the investigator after conviction and sentencing. Like his brother, he was still a minor at this period of time, and even if he did make

18

such a statement, it is obvious that both he and his brother feel badly about the severe sentence that [Robinson] received and are both subject to persuasion after-the-fact from his mother regarding [Robinson].

Edna's statement was available at the time of trial. Edna, however, was already in prison, and probably would have been impeached by a felony conviction had Edna testified. Edna also appears to suffer from "buyer's remorse," as [Robinson] was her boyfriend and she probably did not realize that he would receive such a severe sentence when she made the 911 call to police.  It appears that [Robinson] had been beating her and she was trying to keep him away from her, and that she called 911 out of fear that he was in front of the house in which she was staying and was lying in wait for her to come out.  Nor does [Robinson] show that Edna made a statement to police upon their arrival that night that was consistent with her current affidavit; as Edna was under the excitement of the event, it is more reasonable to believe the statement made at that time rather than her statement made after judgment and sentencing and seeing [Robinson] be sent away for such a severe life term.

Nor is Wanda's current affidavit believable.  It is not known whether Wanda could have been impeached had she testified at trial, but again it is obvious that she feels "buyer's remorse" after seeing [Robinson] sent away for such a severe life term. "It has long been settled that 'the offer of a witness, after trial, to retract [his or her] sworn testimony is to be viewed with suspicion. '  'It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit'" (In re Cox ( 200 3) 30 Cal. 4th 974, 998, 1004).

It appears that these four persons all probably told the police similar stories immediately after the incident, that were consistent with the trial testimony of Roderick and Nicholas.  In addition, there was a fifth witness, Louise, the sister of of [*sic*] Roderick and Nicholas, who testified at trial, in an apparent consistent manner as well; Louise has not recanted.  Nor does [Robinson] show otherwise.  As everyone was in the excitement of the moment at the time arrived, and gave consistent stories from that point on and through the trial, it simply is not now believable that the original stories were not true, especially in light of the severity of the sentence that was given to [Robinson] and the obvious "buyer's remorse" that the four persons are now feeling.

Nor do the recantations show unerring innocence, as is now required to meet an actual innocence exception to the Robbins/Clark bar to the claim (Clark, supra, 5 Cal. 4th 750, 797 fn. 32 [with regard to "error of constitutional magnitude"] , 798 fn. 33 [with regard to "actual innocence"]).  Further, with regard to actual innocence, evidence relevant only to an issue already disputed at trial, which does no more than conflict with trial evidence, does not constitute new evidence that fundamentally undermines the judgment.  Rather, the evidence must be of innocence that could not have been and cannot now be refuted; showing that the evidence might have raised a reasonable doubt is not sufficient (Clark, supra, 5 Cal. 4th 750, 797 fn. 33).

19

Even if Robbins/Clark did not apply, [Robinson] still does not show that he is entitled to relief, as it is not reasonably likely that a jury would reach a different result, were a retrial to ensue to redetermine guilt in light of the recantations. It is not reasonably likely that this court would find, on habeas corpus, that Roderick and Nicholas in fact lied on the witness stand, such that their trial and preliminary hearing testimony could not be considered at a retrial, as they are not now submitting any sworn affidavit from themselves and even if they were, are not stating anything that is so believable now that the court should find their current version true as a matter of fact. Rather, at most, if habeas relief were to be granted on the claim, all prior statements and testimony of Roderick and Nicholas as well as the new statements from these two and Edna and Wanda would be admitted at trial, and it is not reasonably likely that a jury would believe the new statements and find [Robinson] not guilty of either of the substantive charges. Thus, even without the hurdle of the Robbins/Clark bar, the claim would be denied.

For these reasons, [Robinson's] first claim is denied.[53]

The Supreme Court has explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."[54] A new trial is not automatically required when false evidence is discovered. Rather, a constitutional error resulting from the use of false evidence by the government requires a new trial, "if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."[55] Moreover, mere recantation of testimony is not, in itself, grounds for invoking the Due Process Clause against a conviction.[56] Thus, to prevail on his claim, Robinson must first establish that the trial testimony

---

[53] Lodged Doc. 11, Sacramento County Superior Court Order at unnumbered pages 2-6.

[54] Napue v. Illinois, 360 U.S. 264, 269 (1959); see United States v. Agurs, 427 U.S. 97, 103 (1976) ("[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair.").

[55] Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue, 360 U.S. at 271).

[56] Hysler v. Florida, 315 U.S. 411, 413 (1942).

20

of Nicholas and Roderick Johnson was untrue and, if so, that there was a reasonable probability that bringing the recantation to the attention of a jury would alter the outcome.  More importantly, Robinson must show that the Sacramento County Superior Court's rejection of the recantations and determination that, even if presented to the jury on retrial, the recantations would not have affected the outcome, was "an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[57]  Robinson has not met this hurdle.

While a federal habeas petitioner may assert a claim of actual innocence to overcome a procedural bar to review,[58] the Supreme Court has never held that a freestanding claim of innocence is cognizable in a § 2254 petition filed by a non-capital defendant.[59]  *House* declined to answer the question left open in *Herrera*, noting that because "[p]etitioner has failed to make a persuasive showing of actual innocence .  .  .  .  [T]he Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence."[60]  The Ninth Circuit, however, has assumed as much without deciding the question and has held that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."[61]  Following the lead of the circuit, assuming, but not deciding, that a freestanding

---

[57] 28 U.S.C. § 2254(d)(2).

[58] *Schlup v. Delo,* 513 U.S. 298, 326, 327 (1995); *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

[59] *See House v. Bell*, 547 U.S. 518, 554–55 (2006); *District Attorney's Office for Third Judicial District v. Osborne*, 129 S. Ct. 2308, 2321 (2009).

[60] *Herrera*, 506 U.S. at 427 (O'Connor, J. concurring).

[61] *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (adopting the view of Justice Blackmun in his dissent in *Herrara*, 506 U.S. at 442-44 (Blackmun, J., dissenting)).

21

actual innocence claim is cognizable in a § 2254 proceeding, it is necessary to apply the appropriate standard to the evidence.

It is important to note that, in this context, "'actual innocence' means factual innocence, not mere legal insufficiency."[62]  To make the requisite showing of actual innocence, Robinson must produce "new *reliable* evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" and "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[63]  New evidence is relevant evidence that was either excluded or unavailable at trial.[64]  In making its analysis, a federal habeas court considers the entire record, old evidence as well as new, and "on this total record, the court must make a probabilistic determination of what reasonable, properly instructed jurors would do."[65]  In so doing, the court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."[66]

In the context of the hypothetical freestanding actual innocence claim, the Supreme Court has described the threshold as "extraordinarily high."[67]  "The sequence of the Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then

---

[62] *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

[63] *Schlup*, 513 U.S. at 324, 327 (emphasis added).

[64] *Id.* at 328; *Doe v. Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (citing *Schlup*).

[65] *House*, 547 U.S. at 537-38 (citing *Schlup*, 513 U.S. at 329) (internal quotation marks omitted); *Bousley*, 523 U.S. at 630-31.

[66] *House,* 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 331-32).

[67] *Herrera*, 506 U.S. at 417.

establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*."[68]  Measured against this standard, Robinson has fallen far short of establishing his actual innocence.

As the Sacramento County Superior Court noted, the recantation by Nicholas Johnson is an unsworn statement, which, although purportedly bearing Nicholas's signature, was apparently written for him by another person.  Even accepting the signature as genuine, as an unsworn document, it has minimal, if any, evidentiary value.  In addition, it directly contradicts Robinson's own testimony concerning who ripped Nicholas's shirt.  The statement attributed to Roderick Johnson, which is contained in the report of an investigator and is not signed by Roderick, has even less evidentiary value.  As for the two sworn declarations, it is obvious that neither constitutes "newly discovered" evidence, i.e., it was reasonably available to Robinson at the time of trial.

Based on the record before, this Court cannot say that the decision of the Sacramento County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[69]  Robinson is not entitled to relief under his sixth ground.

---

[68] *House*, 547 U.S. at 555.  One Ninth Circuit judge has observed that to prevail on a freestanding actual innocence claim "imposes a much more difficult–indeed possibly insurmountable—burden on the petitioner."  *Smith v. Baldwin*, 510 F.3d 1127, 1156 n.8 (9th Cir. 2007) (Reinhardt, J., dissenting).

[69] 28 U.S.C. § 2254(d).

Ground 7:  Prosecutorial Misconduct (False Evidence)

During cross-examination of Robinson, the prosecutor introduced a Sacramento County Jail Special Needs Form dated January 10, 2006, with the box "2 EAST DETOX - Housing" checked and inquired of Robinson concerning that form.  During the summation the prosecutor argued that Robinson had been drinking and implied he was drunk at the time of the alleged crime.  Robinson argues that, because the internal jail records ("JIMS") show that on January 10, 2006, he was in "INTAKE_INTO_CUSTODY." the evidence the prosecutor relied upon to create the inference he had been drinking, the Detox document, was falsified.  The Sacramento County Superior Court rejected his argument:

> The Claim is barred by Robbins/Clark, and [Robinson] fails to meet an exception to that bar.
> Even if the claim were not so barred, the claim would fail.  [Robinson] also attaches a copy of the jail's "Special Needs Form" for January 10, 2006, filed out by a nurse, that has "2 East Detox - Housing" checked and highlighted by a box around it.  That this was not noted on the "JIMS" is merely a conflict in documentary evidence that had the jury been shown the "JIMS" document, it is reasonably likely that the jury would have believed the nurse's designation over "JIMS" and found that [Robinson] was, in fact, in "detox" right after his arrest.  And as noted by the Third District Court of Appeal in its opinion on the first appeal, [Robinson] made an implied admission that he was housed at "detox" overnight when asked that directly by the prosecutor during [Robinson's].  According to the Third District, "the prosecutor asked [[Robinson]] if he had been drinking that evening.  [[Robinson]] denied it.  The prosecutor then asked [[Robinson]] if he, in fact, was 'housed at detox' that night.  [[Robinson]] answered 'no.'  The prosecutor then offered to show [[Robinson]] the booking form showing where he was housed.  [[Robinson]] declined, stating 'I know where I was housed at.'  The prosecutor then repeated, 'And isn't it true that you were housed at detox?' whereupon [[Robinson]] replied, 'Not for alcohol.'"  In light of that testimony, coupled with the convincing documentation from the jail nurse for that night, the claim would fail in any event.[70]

---

[70] Lodged Doc. 11 at last unnumbered page of Order.

This Court further notes that the "JIMS" report Robinson relies on indicates that at 0400 on January 11 he was transferred from Intake (Bkg M) to 2E, where he stayed until 0752 when he was moved to 04A.[71]   The logical inference to be drawn from that entry is that between 0400 and 0752 Robinson was housed in "2 East Detox."   The very evidence Robinson submits in support of his argument not only undermines, but literally eviscerates, his position.   Robinson has failed to establish that the evidence that the prosecutor relied on in his summation was false.   Robinson is not entitled to relief under his seventh ground.

Ground 8:  Ineffective Assistance of Counsel

Robinson contends that his trial counsel was ineffective in two respects:  (1) in failing to investigate alleged ambiguities in the police records concerning whether he had been drinking and whether or not he had been housed in the Detox housing unit upon his arrest; and (2) in failing to utilize the 911 call transcript to impeach prosecution witnesses.  Robinson raised these claims in his state court habeas petitions.  As the Respondent candidly acknowledges, the state courts did not address Robinson's ineffective assistance of counsel claims.

When there is no reasoned state court decision denying an issue presented to the state court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[72]  "The presumption may be overcome when there is reason to think that some other explanation for the state court's decision is more likely."[73]  In this case, there is nothing in the record that creates a presumption that the

---

[71] Docket No. 1 at 36.

[72] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).

[73] *Id.* at 785.

25

state courts rejected Robinson's argument on the merits.  Where the presumption applies, this

Court must perform an independent review of the record to ascertain whether the state court

decision was objectively unreasonable.[74]  In so doing, this Court presumes that the state court

decision rested on federal grounds,[75] giving the presumed decision the same deference as a

reasoned decision.[76]  The scope of this review is for clear error of the state court ruling on the

petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground by
> *Williams* . . . .  Federal habeas review is not *de novo* when the state court does not
> supply reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of controlling
> federal law.  Only by that examination may we determine whether the state court's
> decision was objectively reasonable.[77]

"[A]lthough we independently review the record, we still defer to the state court's ultimate

decision."[78]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Robinson must show

both that his counsel's performance was deficient and that the deficient performance prejudiced

his defense.[79]  A deficient performance is one in which "counsel made errors so serious that

---

[74] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[75] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989).

[76] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[77] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (internal citation omitted); *see also Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

[78] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

[79] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[80]  Robinson must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[81]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[82]  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[83]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[84]  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

---

[80] *Id.*

[81] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[82] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[83] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[84] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.[85]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[86]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[87]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel

---

[85] 466 U.S. at 689 (internal citations and quotation marks omitted).

[86] *Knowles v. Mirzayance,* 556 U.S. 111, 121 (2009).

[87] *Id.* (citing *Yarborough v. Gentry,* 540 U.S. 1, 5-6 (2003)).

was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different

from an *incorrect* application of federal law."[88]

> Under § 2254(d), a habeas court must determine what arguments or theories
> supported or, as here, could have supported, the state court's decision; and then it
> must ask whether it is possible fairminded jurists could disagree that those arguments
> or theories are inconsistent with the holding in a prior decision of this Court.[89]

As this Court noted in denying Robinson's seventh ground, there was no merit to his

contention based upon the JIMS report that he was not housed in Detox.  Consequently, even if

counsel did not discover it before trial, in light of the documentation provided by the jail nurse,

had it been brought to the attention of the jury, it could not have altered the outcome.  Thus, as to

the JIMS report, even if his trial counsel's performance was deficient, Robinson has failed to

establish that he was prejudiced.

Robinson contends that the transcript of the 911 call shows that Edna Torres told the 911

operator that Robinson was the one being chased by the boys.  Edna Torres did not testify at

trial.[90]  Robinson argues that this information, had it been used, impeached the testimony of

Roderick and Nicholas Johnson, that Robinson chased the them.  The major problem from

Robinson's standpoint is that the same transcript in the same excerpt (19:04) also reveals that the

caller stated that the "subj w/ knife tried to stab C's son."[91]  The 911 transcript also shows

(19:09) "POPN, seeing something move in the veh . . . the Subj w/the knife was hiding in the

---

[88] *Richter*, 131 S. Ct. at 785.

[89] *Id.* at 786.

[90] According to the record, at the time of the trial, Ms. Torres was incarcerated in New
Jersey.

[91] Docket No. 1 at 50.

backseat pulled the knife on the 13 Y/O. . . .”[92]  Although it may have had some impeachment value as far as who was chasing whom, the transcript was far more incriminating than exculpating.

Because it is clear that the assumed decisions of the California courts could have been amply supported, this Court cannot say that those assumed decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[93]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state courts unreasonably applied the correct legal principle to the facts of the Robinson's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decisions were not more than incorrect or erroneous, their application of clearly established federal law was not objectively unreasonable.  Robinson has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that defendant's defense was prejudiced, as required by *Strickland-Hill*.  In particular, Robinson has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Robinson is not entitled to relief under his eighth ground.

---

[92] Docket No. 1 at 51.

[93] 28 U.S.C. § 2254(d).

**C.      Jury Instruction (Presumption of Innocence)**

Ground 2:  Presumption of Innocence

Robinson contends that the trial court stripped him of his constitutional right to a

presumption of innocence.  The California Court of Appeal disagreed.

> During jury voir dire, the trial court admonished the jurors about the
> presumption of innocence in the following terms:
> "As I explained to you earlier, under our system of justice the defendant is
> entitled to the presumption of innocence until the prosecution proves his guilt beyond
> a reasonable doubt.  So if I ask you to vote right now on [[Robinson's]] guilt or
> innocence, you would have to vote for innocence, right?  Because you haven't heard
> any evidence.  Everybody understand that as you sit here right now if I said, all right,
> take a vote right now, you would have to vote innocent because you haven't heard
> any evidence much less enough evidence to prove him guilty beyond a reasonable
> doubt.  That's what I'm talking about. Keep that presumption in your mind *until you
> go into the room to deliberate.*  Is there anyone who cannot or will not follow that
> rule of law?"  (Italics added.)
> Although defense counsel lodged no objection at the time, [Robinson] now
> argues that the italicized remarks require reversal of his convictions because they
> advocated a rule that "unlawfully and unconstitutionally tied and limited the
> presumption of innocence to the evidentiary portion of the trial which ended once the
> jury entered the deliberation room . . . ."  We find no reversible error.
> "In reviewing any claim of instructional error, we must consider the jury
> instructions as a whole, and not judge a single jury instruction in artificial isolation
> out of the context of the charge and the entire trial record . . . .  The meaning of
> instructions is no longer determined under a strict test of whether a 'reasonable juror'
> *could* have understood the charge as the [Robinson] asserts, but rather under the more
> tolerant test of whether there is a 'reasonable likelihood' that the jury misconstrued
> or misapplied the law in light of the instructions given, the entire record of trial, and
> the arguments of counsel."  (*People v. Dieguez* (2001) 89 Cal. App. 4th 266, 276
> (*Dieguez* ).)
> While it is true that the presumption of innocence must be weighed along
> with the evidence in reaching a verdict (*People v. Hill* (1946) 77 Cal. App. 2d 287,
> 293), it must be kept in mind that the court's remark about maintaining the
> presumption "until you go into the [jury] room" occurred during voir dire, before the
> jury had been chosen and before trial had even commenced.  [Robinson] makes no
> claim that the trial judge inaccurately instructed the jury regarding the presumption
> of innocence during the trial itself.  Further, the jury was fully and correctly
> instructed on the presumption at the conclusion of the trial.
> Even if we presume a juror would understand the court's remark the way
> [Robinson] now interprets it, under the circumstances, the court's single statement

31

during voir dire was inconsequential and worked no miscarriage of justice.  (Cal. Const., art. VI, § 13.)  We find no probability that the remark caused the jury to disregard or misapply the presumption of innocence.[94]

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[95]  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.[96]  "[W]e inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."[97]  This Court must also assume in the absence of evidence to the contrary that the jury followed the instructions given by the court.[98]

As the Ninth Circuit has noted, although general orientation at the beginning of a trial should be cautiously worded, an incorrect statement will not require reversal unless it produces prejudice or misleads the jury in a material way.[99]  To the extent that the preliminary instruction in this case was erroneous, it was cured by the final instruction given at the close of the evidence

---

[94] *Robinson*, 2008 WL 5077583 at *5.

[95] *Boyde v. California,* 494 U.S. 370, 380 (1990).

[96] *Francis v. Franklin*, 471 U.S. 307, 309 (1985).

[97] *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (citation omitted); *Victor v. Nebraska*, 511 U.S.1, 6 (1994) (same, citing *McGuire*).

[98] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Franklin*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

[99] *Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988).

and prior to the jury retiring for deliberation.[100]  In light of the controlling Circuit precedent

rejecting Robinson's position and the lack of any holding of the Supreme Court on the issue, this

Court cannot say that the California courts unreasonably applied clearly established Federal law.

Robinson is not entitled to relief under his second ground.

**D.**     **Sufficiency of the Evidence**

Ground 3:  Insufficient Evidence (Assault)  Ground 4:  Insufficient Evidence (Threat)

Robinson contends that the evidence was insufficient to convict him.  The California

Court of Appeal, in rejecting Robinson's arguments, held:

### VII. Substantial Evidence

[Robinson] challenges the sufficiency of the evidence to support both convictions.  We take each one up individually.

*A.  Assault with a Deadly Weapon*

[Robinson] claims there is no substantial evidence to support the ADW conviction because the evidence shows, at most, that he brandished the knife, not that he assaulted anyone with it.  He is wrong again.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."'"  (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

Nicholas testified that after grabbing his shirt and ripping it, [Robinson] reached into his back pocket, pulled out a knife with a four- or five-inch blade and swung it *twice* with a crossing motion from a distance of two to three feet, while yelling "I'll kill you motherfucker."

"'An assault occurs whenever "'[t]he next movement would, *at least to all appearance,* complete the battery.'"  [Citation .]  Thus, assault "lies on a definitional . . . *continuum of conduct* that describes its essential relation to battery:  An assault

---

[100] *See id.* (concluding that the district court did not commit reversible error where the erroneous preliminary instruction was corrected with an accurate final instruction).

is an incipient or inchoate battery; a battery is a consummated assault.""" (*People v. Chance* (2008) 44 Cal.4th 1164, 1170.)

A reasonable jury could easily conclude that [Robinson's] conduct in swinging a long steak knife at Nicholas from relatively close range while threatening to kill him was sufficient evidence to constitute assault with a deadly weapon.

### B.  Criminal Threats

While not denying the testimony elicited by the prosecution witnesses that he threatened to stab, kill and shoot his victims, [Robinson] nevertheless argues that his conviction for making criminal threats lacks evidentiary support because these words were uttered in *lawful self-defense.* The claim is frivolous. [Robinson's] argument is obviously based on his *own* testimony. But the test is whether there is substantial evidence, contradicted or not, to support the jury's verdict. [Robinson's] claim thus turns the standard of review on its head. Moreover, the doctrine of self-defense comes into play where an individual reasonably believes he or she is in imminent danger of suffering bodily injury or being touched unlawfully and thus "reasonably believed that the *immediate use of force* was necessary to defend against that danger." (CALCRIM No. 3470, ¶ 2., italics added.) However, the offense of uttering criminal threats does not entail the use of force, only words. [Robinson] cites no authority that one can successfully defend a charge of making criminal threats by claiming self-defense.[101]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[102]  This Court must, therefore, determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[103]  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does

---

[101] *Robinson*, 2008 WL 5077583 at *8-9.

[102] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[103] *Jackson*, 443 U.S. at 318-19.

not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[104]

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[105]  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.[106]  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.[107]  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[108]  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[109]  This is especially true where the highest court in the state has denied review of the lower court's decision.[110]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial

---

[104] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

[105] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[106] *Jackson*, 443 U.S. at 324 n. 16.

[107] *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

[108] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[109] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[110] *Id.*; *see West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

35

error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[111]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[112]  It is through this lens that this Court must view an insufficiency of the evidence claim.

Robinson misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain a conviction.[113]  In this case, the California Court of Appeal determined that there was sufficient evidence of each element of the crimes to support Robinson's conviction.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[114]  Robinson bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous;[115] a burden Robinson has failed to carry.  The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, especially considering the double deference owed under *Jackson* and AEDPA.  Robinson is not entitled to relief under either his fourth or fifth grounds.

---

[111] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[112] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted); *see Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam).

[113] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[114] *See Jackson*, 443 U.S. at 326.

[115] 28 U.S.C. § 2254(e)(1).

## V.  CONCLUSION AND ORDER

Robinson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Robinson's request for an evidentiary hearing is

**DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[116]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[117]

The Clerk of the Court is to enter judgment accordingly.

Dated: October 5, 2012.

　　　　　　　　　　　　　　　　　　　/s/ James K. Singleton, Jr.
　　　　　　　　　　　　　　　　　　JAMES K. SINGLETON, JR.
　　　　　　　　　　　　　　　　　United States District Judge

---

[116] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

[117] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

37